1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                       HOUSTON DIVISION

4    UNITED STATES OF AMERICA        §      CASE NO. 4:20-CR-26
                                     §      HOUSTON, TEXAS
5    VERSUS                          §      MONDAY,
                                     §      DECEMBER 23, 2019
6    VICTOR RICARDO CAMACHO          §      10:48 A.M. TO 11:22 A.M.

7


8
            PRELIMINARY EXAMINATION AND DETENTION HEARING
9
              BEFORE THE HONORABLE PETER J. BRAY
10                UNITED STATES MAGISTRATE JUDGE

11

12      APPEARANCES:                     SEE NEXT PAGE

13      COURT RECORDER:                  L. HOWARD

14      COURT CLERK:                     S. JONES

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 ELDRIDGE ROAD, #144
22               SUGAR LAND, TEXAS 77478
                   Tel: 281-277-5325
23            www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

1                              APPEARANCES:

2

3   FOR THE PLAINTIFF:              U.S. ATTORNEY'S OFFICE
                                    Jennifer C. Stabbe, Esq.
4                                   1000 Louisiana Street
                                    Suite 2300
5                                   Houston, TX  77002
                                    713-567-9000
6

7   FOR THE DEFENDANT:             FEDERAL PUBLIC DEFENDER
                                    Heather M. Hughes, Esq.
8                                   4400 Louisiana Street
                                    Suite 1350
9                                   Houston, TX  77002
                                    713-718-4600

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Nathaniel Adibe | 5 | 21 | | |

| EXHIBITS: | Marked | Offered | Received |
|---|---|---|---|
| Government Exhibits 1 to 5 | -- | -- | 15 |

1        HOUSTON, TEXAS; MONDAY, DECEMBER 23, 2019; 10:48 A.M.

2            THE COURT:  Victor Ricardo Camacho, please.  Are

3    we doing both Preliminary and Detention?

4            MS. HUGHES:  Yes, Your Honor.

5            THE COURT:  All right.

6        (Pause in the proceedings.)

7            THE COURT:  Are you ready?

8            MS. STABE:  Jennifer Stabe for the United States.

9            THE COURT:  Okay.

10           MS. HUGHES:  Heather Hughes for the Defendant.

11           THE COURT:  All right.  Sir, tell me your name so

12   I know that we have you here.

13           DEFENDANT CAMACHO:  Victor Ricardo Camacho.

14           THE COURT:  All right.  By the way, I said the

15   other day -- and I don't know if this was communicated to

16   you -- this is not a Fourth Amendment type hearing.  We're

17   not doing a suppression hearing.  I read this.  I understand

18   what you may do later.

19           You want to get some facts about that kind of

20   thing, that's fine.  But I can't suppress evidence, clear?

21           MS. HUGHES:  I understand, Your Honor.

22           THE COURT:  All right.  Go ahead.  Call your first

23   witness.

24           MS. STABE:  The Government calls Special Agent

25   Nathaniel Adibe.

1        (Witness sworn.)

2              MS. STABE:  May I proceed, Your Honor?

3              THE COURT:  Yes.

4                 DIRECT EXAMINATION OF NATHANIEL ADIBE

5   BY MS. STABE:

6   Q    Could you please state and spell your name for the

7   Record?

8   A    Nathaniel Adibe.

9   Q    And what's your current position?

10  A    I'm a Special Agent with the ATF.

11  Q    How long have you been with ATF?

12  A    About six years.

13  Q    Can you just go briefly into your training and

14  experience in investigating gun cases?

15  A    Yes.  So I spent about six months in the criminal

16  investigating training program at --

17             THE COURT:  Well, does anybody dispute that he's

18  qualified?

19             MS. HUGHES:  No, Your Honor.

20             THE COURT:  All right, go ahead.  You don't need

21  to do all that.  And it's says it in the affidavit.

22             MS. STABE:  Okay, thank you, Your Honor.

23             THE COURT:  And he swore to and it's all true.

24  BY MS. STABE:

25  Q    So let's just move then straight to December 19th,

1   2019.  Were you working that day with ATF?

2   A    Yes, ma'am.  I was.

3   Q    And at some point that afternoon, did you get a call

4   from the Fort Bend County Sheriff's Office about a traffic

5   stop that had been conducted?

6   A    Yes, ma'am.

7   Q    Okay, who was the officer or deputy that had conducted

8   a traffic stop?

9   A    Deputy Tomet (phonetic)-- I know him by Danny, excuse

10  me.

11  Q    You know him by Danny?

12  A    Yes.

13  Q    And is that Daniel Tandera (phonetic)?

14  A    Tandera, yes.

15  Q    Okay.  And do you get information about where that

16  traffic stop had been conducted?

17  A    Yes, ma'am.  An area of 59 South and Grunwald Road.

18  Q    And is that in the Southern District of Texas?

19  A    Yes, it is.

20  Q    So, what information did you get from Deputy Tandera

21  about what had happened to cause that traffic stop?

22  A    Yes, ma'am.  So he pulled over a black Nissan Altima

23  for speeding, 74 in a 55 mile an hour zone, at which time he

24  did a traffic stop, made contact with the driver later

25  identified as Victor Camacho.

1        In the vehicle was also two other passengers a Lucilla

2    Banda (phonetic) and their two-year-old daughter.

3    Q    And do you recall how was Defendant Camacho identified?

4    A    By a driver's license.

5    Q    At some point did you end up seeing Victor Camacho

6    yourself?

7    A    Yes, ma'am, I did.

8    Q    Do you see that same person in the courtroom today?

9    A    Yes, ma'am.

10   Q    Could you please point to him and identify an article

11   of clothing he's wearing?

12   A    He's in an orange jumpsuit next to his lawyer.

13          MS. STABE:  May the Record reflect the witness has

14   identified the Defendant?

15          THE COURT:  Yes.

16      (Defendant identified.)

17   BY MS. STABE:

18   Q    Okay, so back to the traffic stop.  So a stop for

19   speeding, 74 in a 55?

20   A    Yes, ma'am.

21   Q    Okay.  And once that deputy who pulled him over got him

22   out of the car, did they have a conversation?

23   A    Yes, he then brought him back to his patrol vehicle,

24   let him sit in the front passenger seat while he gave him a

25   written warning.

NATHANIEL ADIBE - DIRECT BY MS. STABE                    8

1    While giving him his written warning, he spoke to him

2 about why he came to Houston, how long he'd been in Houston

3 for, how often he comes to Houston, and observed some

4 discrepancies along with some verbal and non-verbal cues

5 showing deception.

6 Q    Okay.  And did he also -- did he have law enforcement

7 databases that he was running information on at the same

8 time as conducting his questions?

9 A    Yes, ma'am.

10 Q    Okay.  So based on the deception, what did that -- or

11 the perceived deception, what did Deputy Tandera do?

12 A    He decided to get his canine partner and do an open air

13 sniff with his canine.  He then took the other two

14 passengers out of the vehicle, proceeded --

15         THE COURT:  Did he already have the dog with him?

16         THE WITNESS:  Yes.

17         THE COURT:  It just so happened to be a canine

18 unit that stopped him?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  Okay.

21         THE WITNESS:  He then took the other two

22 passengers out of the vehicle.  Did an open air sniff with

23 the canine and the canine alerted on the driver's side front

24 door.

25 BY MS. STABE:

1  Q    And so once the canine alerted, did Deputy Tandera then

2  search the vehicle?

3  A    Yes, he searched the vehicle and found a .50 caliber

4  rifle with an obliterated serial number in the trunk of the

5  vehicle along with approximately 100 rounds of .50 caliber

6  ammunition.

7  Q    Okay.  Now, once finding that firearm, is that when you

8  were contacted to come and assist with this stop?

9  A    Yes, ma'am.

10 Q    Okay.  So when you got to the location, was it the same

11 scene on the side of the road or had it been moved to a

12 safer location?

13 A    It had been moved to a safer location by the time I got

14 there.

15 Q    Okay.  So what did you do once you arrived at the

16 scene?

17 A    I arrived on the scene.  My partner, we then spoke to

18 Mr. Camacho, read him Miranda and he agreed to speak with

19 us.

20 Q    Okay, so after hearing his rights, he knowingly and

21 voluntarily waived those rights?

22 A    Yes, ma'am.

23 Q    Okay.  What did he tell you about his purchase of that

24 .50 caliber rifle?

25 A    He advised he purchased the firearm along with the

1  ammunition for $6,000.  He advised that he knew that the

2  firearm had an obliterated serial number.  He stated that he

3  knew that it was illegal to have a firearm with an

4  obliterated serial number.

5  Q    And when you're saying "obliterated serial number,"

6  could you describe to the Judge just how was it appeared to

7  you at the scene?

8  A    So of course every firearm has a serial number on it.

9  So it was scratched down and then had sort of a black

10  matting over it so you could not see what number it was.

11  Q    And how many locations were altered or obliterated?

12  A    Three locations.

13  Q    So he said that he was aware that the serial numbers

14  had been removed or obliterated; is that right?

15  A    Yes, ma'am.

16  Q    Okay.  At some point, did someone from your agency

17  speak to a nexus expert?

18  A    Yes, ma'am.

19  Q    Okay.  And what did that expert say about whether or

20  not this firearm was manufactured in Texas?

21  A    It was manufactured outside the State of Texas.

22  Q    So it's moved in interstate commerce?

23  A    Yes, ma'am.

24  Q    What other information did you learn from the Defendant

25  during your conversation with him?

1   A     Also during that -- excuse me.  He also provides that

2   he was -- during an incident on December 5th in Brownsville,

3   Texas that he shot the firearm, as well as the firearms that

4   were received on December 5th.  He received from a Israel

5   Chapa (phonetic).

6   Q     Okay.  So, as far as the case with the .50 caliber,

7   basically he admitted that he purchased it that day for

8   $6,000 and he knew the serial number was obliterated, right?

9   A     Correct.

10  Q     Okay, in that conversation did you get any other

11  information -- just about that particular transaction?

12  A     That he paid $6,000 for it.  He got it from a friend.

13  That's all I recall right now.

14  Q     Okay.  And so let's move on to some other information

15  about this investigation.  In order to prepare for today's

16  hearing, the detention hearing, did you look into some other

17  information about the Defendant?

18  A     Yes, ma'am.

19  Q     Okay, so first, you were talking about something that

20  happened in Brownsville; is that right?

21  A     Yes, ma'am.

22  Q     Okay, is the Defendant currently charged with any

23  offense out of Brownsville, Texas?

24  A     Yes, a Class A misdemeanor for shooting a firearm.

25  Q     Discharging a firearm?

1   A    Yes, ma'am.

2   Q    And is he currently on bond for that offense right now?

3   A    Yes, ma'am.

4   Q    Did you have an opportunity to review the Brownsville

5   Police Department report?

6   A    Yes, ma'am.

7   Q    Okay, so during that actual offense -- well first, do

8   you recall or did you read what day that offense happened?

9   A    On December 5th, 2019.

10  Q    Okay.  And during that offense, was it alleged that the

11  Defendant shot a firearm in the direction of a business?

12  A    Yes, ma'am.

13  Q    Okay.  And in fact, do you recall how many rounds it

14  was that were actually recovered or struck the business?

15  A    I believe it was two that actually struck the business.

16  Q    Okay.  In addition, once the Defendant was pulled over

17  and --

18          THE COURT:  Well, wait, wait, wait.  So did that

19  happen during the day?  Was anybody inside the business?

20          THE WITNESS:  It was -- all I know is on the

21  report the arrest happened about 9:50 p.m. that evening.

22          THE COURT:  Do you know if anybody was in the

23  building at the time that it was shot?

24          THE WITNESS:  No, sir, I do not.

25          THE COURT:  Okay, go ahead.

1  BY MS. STABE:

2  Q    Okay, but there was -- correct me if I'm wrong.  There

3  was a witness that reported that his business had been shot

4  with a firearm; is that right?

5  A    Yes, ma'am.

6  Q    Okay, and in the report it's not clear if that person

7  was inside the business at the time or not, right?

8  A    Correct.

9  Q    Okay.  But there were shots fired and that's why police

10 were dispatched?

11 A    Yes, ma'am.

12 Q    Okay.  So whenever the Defendant's truck or vehicle was

13 pulled over and he was detained, was it searched at some

14 point for firearms?

15 A    Yes, ma'am.  He gave consent to search the vehicle.

16 Q    Okay.  And --

17         MS. STABE:  May I approach the witness, Your

18 Honor?

19         THE COURT:  Yes.

20 BY MS. STABE:

21 Q    I'm showing you Government's Exhibits 1 through --

22         THE COURT:  When was this now?  What's the date of

23 this?

24         THE WITNESS:  December 5th.

25         THE COURT:  Okay.

1  BY MS. STABE:

2  Q    Showing you Government's Exhibit 1 through 5.  Do you

3  recognize those?

4  A    Yes, ma'am.

5  Q    Okay.

6           THE COURT:  So wait.  So there's a report that

7  shots are fired and then how is it that they pull him over?

8           THE WITNESS:  So, I'll tell you everything right

9  now.  So, shots fired, complaint happened, occurred.

10 Officers went to talk to the witness.  While speaking to the

11 witness, a car drives by.  The witness says that's the

12 vehicle right there, at which time the officers wait to

13 catch up to the vehicle and pull it over.

14           THE COURT:  Okay, go ahead.

15 BY MS. STABE:

16 Q    Okay.  And then once the vehicle is pulled over, the

17 Defendant Victor Camacho gives consent to search his

18 vehicle?

19 A    Right.

20 Q    Okay.

21           MS. STABE:  And so I'll tender to opposing counsel

22 any objections to Government's 1 through 5?

23           MS. HUGHES:  No objections.

24           MS. STABE:  Okay, Your Honor.

25           THE COURT:  They're admitted for this.  But you

1  can hand them up.

2       (Government's Exhibits 1 through 5 received in

3  evidence.)

4  BY MS. STABE:

5  Q    Okay, and so -- I should have given you extra copies.

6       But in Government's 1 through 5 what are we looking at

7  in those photographs?

8  A    So during the search of the vehicle, you see like a

9  foam over -- first of all, found in the vehicle was in the

10  central -- center console was a Glock 19 .9 millimeter

11  handgun.  There were 10 .50 cal magazines found.

12           THE COURT:  So tell me just -- hold on, hold on.

13  What's in Exhibit 1?

14           THE WITNESS:  I'm not sure.  Which one is --

15           THE COURT:  Here, take these.  Just do it so we

16  get a Record.

17  BY MS. STABE:

18  Q    Okay.  So in Government's Exhibit 1, what do we see

19  here?

20  A    Right now you see the uppers for at least what appear

21  to be about three -- four, excuse me, four diamond back

22  rifles.  The top part is the lower for the actual rifle

23  itself.

24  Q    Okay.  And are these known as AR-15's?

25  A    Yes, ma'am.

NATHANIEL ADIBE - DIRECT BY MS. STABE                16

1  Q    Okay, Government's Exhibit 2, it's not clear -- it

2  might be a different angle for what's in Government's

3  Exhibit 1.  Is that --

4  A    Correct.

5  Q    Okay.  In Government's Exhibit 3, what do you see here?

6  A    These right here are PS-90 fifth round magazine drums.

7  They're hidden in a speaker box.

8  Q    And Government Exhibit 4, what do we see?

9  A    This is the same type of magazine, but this is the

10  other.  Like, so four was on the left side of the speaker

11  box.  Another four within the right side of the speaker box.

12  I'm not sure which side is which.

13  Q    And Government Exhibit 5?

14  A    Right here you have some more drums.  I'm not sure if

15  these are the 10 AR P mag 50 round drums.  But also you have

16  .50 cal magazines stacked up, packaged on the -- this

17  package.  It looks like delivery or something.

18         THE COURT:  Is there anything illegal about any of

19  that stuff?

20         THE WITNESS:  No, sir.

21         THE COURT:  Okay.

22  BY MS. STABE:

23  Q    Okay.  But as far as in your training and experience,

24  the way that they're packaged is that consistent with

25  anything that you've seen?

1  A    Firearms trafficking.

2  Q    Okay, and was there actually a blue roll of painter's

3  tape found in the Defendant's truck that day as well?

4  A    Yes, ma'am.

5  Q    Okay.  When the Defendant was detained at that time,

6  did he give a statement after he read his Miranda rights?

7  A    Yes, ma'am.  Initially he told ATF the reason why it

8  was packaged that way was because it was too big for

9  vehicle.  ATF (indiscernible) truck, he changed the story to

10 when he purchased it from a male by the name of George Lopez

11 the day before it came that way.  He purchased it for $5500.

12 Q    $5500?

13 A    Yes, ma'am.

14 Q    Okay.  And now whenever he was interviewed in this case

15 on December 19th, did he change his story about what --

16 where the firearms came from on the December 5th case?

17 A    Yes, ma'am.  That's when he said that he got the

18 firearms from a Israel Chapa.

19 Q    Okay.  Did he know Israel Chapa by a different name?

20 A    Yes, but I do not recall the name.

21 Q    Okay.  But you were able to identify that it was

22 somebody that you know as Israel Chapa?

23 A    Yes.

24 Q    Okay.  At the time in both instances, what was he

25 saying he was going to do with the firearms?

1  A     Just keep them because he loved firearms.

2  Q     Okay.  And yet just turning your attention to the

3  Pretrial Services Report that we discussed, how many

4  firearms does the Defendant say that he had?

5  A     Two.

6  Q     He said he only owns two handguns?

7  A     Correct.

8  Q     Yet on these two occasions he was buying multiple --

9  well, one instance there were multiple firearms, ammunition,

10 magazines in his vehicle.  And then there was a .50 caliber

11 rifle with more ammunition in his vehicle and he says those

12 are going to be just for him?

13 A     Yes, ma'am.

14 Q     When he was interviewed on December 19th by ATF, did he

15 change his story at all about whether or not he was the

16 shooter in December 5th incident?

17 A     Yes, he said that he did it.

18 Q     Okay.  And at December 5th did he say he did shoot or

19 he did not?

20 A     He did not.

21 Q     Have you also had the opportunity to look at the

22 Defendant's Texas Workforce Commission history?

23 A     Yes, ma'am.

24 Q     Okay.  And what did you find in looking at that?

25 A     He has not had a job -- at least in the State of

1  Texas -- like last year.

2  Q    Okay.  And what was the total amount of in just these

3  two transactions that he purchased firearms?

4  A    Yeah, one was 6,000; the other one was 5500.

5  Q    So $11,500?

6  A    Yes, ma'am.

7  Q    On firearms in the last month?

8  A    Yes, ma'am.

9  Q    In addition, did you have an opportunity to check the

10 Defendant's border crossings?

11 A    Yes, ma'am.  He's had approximately 31 crossings since

12 September.  He's had 17 in November and actually had one

13 while on bond for this December 5th incident.

14 Q    Okay, and that was on December 14th, 2019, he crossed

15 into Mexico; is that right?

16 A    Yes, ma'am.

17 Q    Okay.  And now Investigator Adibe, in working on this

18 case with Defendant Camacho, basically what started this

19 investigation that kind of led to this?

20 A    Okay.  So on December 2nd, 2019, CBN Cartel members

21 raided City Hall in Mexico where approximately 21 people

22 were killed including four police officers.  A government

23 helicopter was actually shot and had to do an emergency

24 landing.

25      Several firearms were seized during this incident to

NATHANIEL ADIBE - DIRECT BY MS. STABE                    20

1  include a .50 cal rifle that was traced back to Israel

2  Chapa, which had a 13-day tie to crime.  What that means,

3  when I purchase the firearm today and if something happens,

4  like next Monday, that would be a week tie to crime.

5  Q    And at some point did ATF speak with Israel Chapa?

6  A    Yes.  On December 13th, 2019, ATF interviewed Israel

7  Chapa.  ATF was able to determine that Chapa purchased

8  approximately 104 firearms since July with over 100 of those

9  being lone guns -- lone guns like AR's, AKE's or .50 caliber

10 rifles.

11      Chapa advised about over 100 of those firearms went to

12 Mr. Camacho.

13 Q    And did he also advise that the M2's found at the scene

14 of massacre in Mexico he had delivered those to Defendant

15 Camacho?

16 A    Yes.  He advised that he purchased two .50 caliber

17 rifles and --

18          THE COURT:  Wait, wait.  He got -- you can't just

19 say he --

20          THE WITNESS:  Sorry.

21          THE COURT:  -- he, he.  We don't know who you're

22 talking about.

23          THE WITNESS:  Chapa advised that he purchased two

24 .50 caliber rifles and sold them to Camacho.

25 BY MS. STABE:

NATHANIEL ADIBE - DIRECT BY MS. STABE                    21

1  Q    And those are the same ones that ATF traced from the

2  scene of that crime in Mexico to the --

3  A    Well one of them was.

4  Q    One of them.

5  A    A lot of those firearms had obliterated serial numbers,

6  so we're still trying to work on getting those.

7  Q    Okay.  So there's definitely the one M2 that's been

8  traced to being purchased by Israel Chapa; is that right?

9  A    Yes.

10 Q    And Israel Chapa stated he sold that firearm to Victor

11 Camacho?

12 A    Correct.

13 Q    And the time to crime on that rifle was 13 days?

14 A    Yes, ma'am.

15      (Pause in the proceedings.)

16         MS. STABE:  I'll pass the witness.

17         THE COURT:  All right.  Cross?

18            CROSS-EXAMINATION OF NATHANIEL ADIBE

19 BY MS. HUGHES:

20 Q    So for this traffic stop, are there recordings of the

21 traffic stop?

22 A    Yes, ma'am.

23 Q    What kind of recordings?

24 A    I believe video and audio.  I haven't seen any of the

25 recordings yet.

1  Q    Do you know if there were body cameras?

2  A    I believe there were.  I'm not sure yet.

3  Q    Do you know if there were dash cameras?

4  A    I believe so.

5  Q    The gun that was found, was in the trunk?

6  A    Correct.

7  Q    And the gun was found in an inoperable condition?

8  A    It was in two separate parts.

9  Q    Okay.  So the gun couldn't be fired in the condition

10 that it was found in?

11 A    Correct.

12 Q    So to the best of your knowledge, has my client ever

13 been convicted of a crime?

14 A    No.

15 Q    And were there any drugs found in the car?

16 A    No, ma'am.

17 Q    And did the dog alert to the smell of marijuana?

18 A    I'm not sure what the dog actually alerted to.

19 Q    Was the dog trained to alert to the scent of drugs?

20 A    Narcotics, yes.

21 Q    Narcotics, okay.  And no officer discovered any

22 narcotics?

23 A    Correct.

24 Q    So then, what did the dog alert to?

25 A    Well, I guess speaking with -- when the deputy spoke

 1  with Mr. Camacho, he advised that he had been around people

 2  that had been doing narcotics.

 3  Q    So did the dog alert to those people who had been doing

 4  narcotics?

 5          MS. STABE:  Your Honor, I'm going to object to

 6  speculation.

 7          THE COURT:  Yeah, and I understand what's going to

 8  happen later here, but I cannot suppress this evidence.  I

 9  mean, the evidence is that they find this gun and he admits

10  to it.

11          If you want to focus on that, go ahead, but

12  there's a dog, it alerted.  You know, you can do all kinds

13  of things about that later, just not here.

14          MS. HUGHES:  I'll move on, Your Honor.  I don't

15  have any further questions for the witness.

16          THE COURT:  All right.  Anything else?

17          MS. STABE:  Nothing else from the Government, Your

18  Honor.

19          THE COURT:  All right you can step down, thanks.

20          THE WITNESS:  Thank you, sir.

21      (Witness steps down.)

22          THE COURT:  Any other witnesses or evidence from

23  the Government at all?  Do you rest?

24          MS. STABE:  Government rests, Your Honor.

25          THE COURT:  All right.  Defense?

1          MS. HUGHES:  I'd like to proffer, Your Honor --

2          THE COURT:  You can, yeah.

3          MS. HUGHES:  -- the testimony of Lucille Banda

4   (phonetic).  She's here in the courtroom.

5          THE COURT:  And she's who to the Defendant?

6          MS. HUGHES:  She is the mother of his child.

7          THE COURT:  Okay.

8          MS. HUGHES:  She would say that he was born and

9   raised in Brownsville.  He's been there all his life.  She

10  would say that he has licenses for open and concealed carry

11  of firearms.

12         She would say that she's willing to be a

13  third-party custodian.  And she would say that he would be

14  living with her, their daughter, and his mother if he were

15  released.

16         And his mother, Juanita Certa (phonetic) is also

17  here as well, if the court has questions for her.

18         THE COURT:  Okay.  Anything else?

19         MS. HUGHES:  No.

20         THE COURT:  Do you rest?

21         MS. HUGHES:  Yes, I rest, Your Honor.

22         THE COURT:  Argument.

23         MS. STABE:  Yes, Your Honor.  Your Honor, the

24  probable cause in this case is pretty cut and dry.

25         THE COURT:  Yeah, is there any argument about

1  probable cause?

2       MS. HUGHES:  No argument for probable cause, Your

3  Honor.

4       THE COURT:  All right, then let's talk about

5  detention.

6       MS. STABE:  Okay.  Your Honor, the Government

7  would argue that there's no condition or series of

8  conditions that could be in place to ensure both the safety

9  of the community and the Defendant appearing.

10       As far as safety of the community, he's been found

11  on more than one occasion with high power rifles.  In

12  Brownsville he had at least four AR 15's.  And the way that

13  they were packaged along with all the ammunition was

14  consistent with gun trafficking.

15       In addition, December 5th, he's admitted to being

16  the person that shot his firearm, you know, at or in the

17  direction of the building.  There were two, I guess, two

18  holes in the building where they determined that it actually

19  had been shot into the building.  And he now initially lied

20  about it, but then admitted that he was the one that shot.

21       THE COURT:  And the person on the scene knew what

22  the car looked like?

23       MS. STABE:  Yes, Your Honor.  The person on the

24  scene knew what the car looked like.  And while being

25  interviewed by the police, identified that's the car that

1   shot up the building as the Defendant drove by.

2          You know, he's on bond currently and I can imagine

3   that he's not supposed to be committing new law violations

4   while he's on bond even for a Class A Misdemeanor.  And he

5   also December 14th left the country and went into Mexico

6   while he was on bond.

7          He's -- the guns that he purchased from Israel

8   Chapa have been tied back to a massacre of 22 people in

9   Mexico that occurred in the beginning of December.  And

10  those were all -- the M2 is a high-powered rifle that is

11  what the army uses attached to their Humvee's.

12         I mean this was not just handguns, not just

13  shotguns.  These are actually high-powered rifles that

14  definitely cause a danger --

15         THE COURT:  Are these fully automatic?  Does

16  anybody know?  I mean, we didn't have evidence of that.

17         MS. STABE:  Your Honor, the ones that were

18  recovered in Mexico had been converted to fully automatic.

19         THE COURT:  Okay, so --

20         MS. STABE:  When they were purchased in the US

21  they were semi-automatic.

22         In addition, the Defendant has no current income

23  and no employer, yet he's able to purchase over $11,000

24  worth of firearms in the month of December.  And his travels

25  to Mexico is extensive, 31 times since the beginning of

1   September, 17 times just in November.

2           He told Pretrial Services that he only goes four

3   to five times a month to visit a girlfriend.  And whether

4   he's going to visit a girlfriend or to traffic in firearms,

5   he's clearly able to go back and forth easily to Mexico.

6           He has ties to Mexico and he frequents going to

7   Mexico.  If he gets out, he would not be living in the

8   Houston area.  He lives in the Brownsville area, which would

9   be very close to the border.

10          So he would have direct access to being able to

11  leave the country.  He can leave the country even if he

12  doesn't have a passport.  He states he doesn't have one

13  currently, so the bond condition of, you know, not obtaining

14  a passport wouldn't stop him from traveling out of the

15  country.

16          In addition, you know, his bond conditions of not

17  being in possession of a firearm, he's clearly not going to

18  comply with that.  He was on bond for a discharge of a

19  firearm and then within two weeks was then purchasing a

20  .50 caliber rifle from the Houston area.

21          So based on all of these pieces of information,

22  the Government would ask that the Judge detain the Defendant

23  until the conclusion of this case.

24          THE COURT:  Okay.  Argument.

25          MS. HUGHES:  Your Honor, this is not a presumption

1    case.  The Government bears the burden of showing that there

2    are no conditions that will reasonably assure the safety of

3    the community.

4            Mr. Camacho has no history of violence.  He does

5    not have any criminal convictions.

6            THE COURT:  Well, is shooting -- firing a gun into

7    a building, is that violent?  Is it not violent?

8            MS. HUGHES:  Your Honor, he's presumed innocent in

9    that case.  And I think there's limited evidence about,

10   like, there's the bullet holes in the --

11           THE COURT:  Well he admitted it, right?

12           MS. HUGHES:  He admitted it.

13           THE COURT:  He got seen by a witness.  That

14   witness, you know, was able to identify out of the blue, a

15   car that had a whole boat load of guns in it.  That seems

16   pretty -- I mean, --

17           MS. HUGHES:  Yes, his car did have guns in it.

18   He --

19           THE COURT:  And he's been charged.

20           MS. HUGHES:  He does have a concealed and open

21   carry license.  The possession of those guns was not legal.

22           THE COURT:  Illegal, not illegal.

23           MS. HUGHES:  Not what?

24           THE COURT:  Not illegal.

25           MS. HUGHES:  Not illegal, yes.  Correct.

1          THE COURT:  You said not legal.

2          MS. HUGHES:  It is legal for him to have those

3   weapons, yes.

4          He's lived in Brownsville --

5          THE COURT:  Is it legal for him to sell guns to

6   people in Mexico?  Does he have the authority to do that?

7          MS. HUGHES:  I don't know that that is relevant

8   question for the bond hearing.

9          THE COURT:  Why not?

10          MS. HUGHES:  I think that what's at issue is

11   whether he's going to be a danger to the community.  I think

12   we can cite conditions so that he will not be, I think,

13   removing possession of fire -- you know removing all

14   firearms, setting up a condition that he can't possess

15   firearms.  Home detention.  If the Government is worried

16   about risk of flight, I think electronic monitoring would be

17   appropriate.

18          His travel into Mexico was not a violation of his

19   bond.  He had permission for the trip that occurred in

20   between his December 5th and this date.

21          THE COURT:  Was he truthful with Pretrial about

22   the amount of foreign travel?

23          MS. HUGHES:  My -- I don't have records regarding

24   how often he's been in and out of Mexico.

25          THE COURT:  Well, the agent said like 17 times

1  just in November, right?

2        MS. STABE:  Yes, Your Honor, 17 times in November.

3        MS. HUGHES:  That's more than what he told

4  Pretrial, Your Honor.

5        THE COURT:  All right.  Go ahead.

6        MS. HUGHES:  He does have ties to Brownsville.

7  He's lived there his whole life.  His wife -- or his

8  girlfriend is here in the courtroom and is prepared to be

9  his third-party custodian.

10        But I don't think the Government's burden in this

11  case has been met.  There's no indication he's used these

12  guns.  There's no indication that he's -- he has, you know,

13  intentionally tried to harm someone.

14        THE COURT:  Okay, anything else?

15        MS. HUGHES:  I think that's all, Your Honor.

16        THE COURT:  All right, anything else?

17        MS. STABE:  That's all from the Government, Your

18  Honor.

19        THE COURT:  All right, so there -- I find probable

20  cause.

21        The question of risk of flight first:  The

22  Government's burden is only to show a risk of flight by a

23  preponderance of the evidence, and I think they've done

24  that.

25        So, first of all, he was on bond when he committed

1   this offense.  He -- even taking it to be the case that all

2   of these things that were found in his vehicle on

3   December 5th, even if those things were legal, it's clear

4   from the evidence that he's trafficking in firearms.  He's

5   trafficking in large firearms.  He's shot a firearm at a

6   business.

7        And then he's on bond for that and then he commits

8   this.  It's just -- it's all part and parcel.

9        So one, I don't think he's going to follow my

10  rules.  I just don't.  I think that there's almost no

11  possibility that -- so to the extent there are conditions

12  that could ameliorate risk of flight, I don't think he's

13  going to follow them.  And that's my problem with this.

14       He was truthful to Pretrial about the number of

15  times he's traveled to Mexico.  He's got significant ties to

16  Mexico.

17       So, he has no job since, I guess for more than a

18  year.  Is that the evidence that we have or am I getting

19  that wrong?

20       MS. STABE:  Your Honor, his Texas Workforce

21  Commission history, it doesn't show he has any job in Texas.

22  He did report some income several months ago in August in

23  Washington State.

24       MS. HUGHES:  Yes, Your Honor, I believe that he

25  was employed with his mother's company.

32

1              THE COURT:  Well, he reported being unemployed.

2    So he certainly doesn't have stable employment.  He's -- he

3    has the ability to stay with his mother, but he also admits

4    bouncing around.  So I find by a preponderance of the

5    evidence that he's a risk of flight.

6              And as to dangerousness.  Even if the guns are

7    legal, he's got a lot of guns and he's got a lot of access

8    to people with guns and he's, at least by clear and

9    convincing evidence, he's trafficking firearms to Mexico.

10             I'm not blaming him for a massacre.  Okay, I'm

11   not.  He didn't massacre anybody.  But the guns are making

12   it into the hands of bad people.

13             And he -- I mean, I think it's a big deal shooting

14   a gun at a business.  It's very different than, you know,

15   popping off a round.  He shot it at a business.

16             That's dangerous and he has, you know, I know that

17   we can probably tell him to get rid of his firearms.  But

18   again, he wasn't suppose to have -- well, look.  I don't

19   know what his bond conditions were.  But while he's on bond,

20   he's got a large firearm with an obliterated serial number.

21             So again, he won't follow conditions bleeds into

22   also the dangerousness.  I don't think that I can set any

23   conditions that he'll follow that will keep the community

24   safe from him and his guns.

25             So I remand you to custody of the Marshal

1  pending -- the next step in your case is that the Government

2  will indict you, if that's what they choose to do, and

3  you'll be brought back to Court to plead not guilty.

4          Anything else?

5          MS. STABE:  Nothing else from the Government, Your

6  Honor.

7          MS. HUGHES:  Nothing, Your Honor.

8          THE COURT:  All right, you're excused.

9          MS. STABE:  Thank you.

10      (Proceeding adjourned at 11:22 a.m.)

11                      * * * * *

12       *I certify that the foregoing is a correct*

13  *transcript to the best of my ability produced from the*

14  *electronic sound recording of the proceedings in the above-*

15  *entitled matter.*

16  */S/ MARY D. HENRY*

17  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

18  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

19  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

20  *JTT TRANSCRIPT #61997*

21  *DATE FILED:  APRIL 7, 2020*

22

23

24

25